183 P.3d 1269

Virgel CAIN, Sandy Bahr, Scott Holcomb, Arizona Association of School Business Officials, Arizona Education Association, Arizona Federation of Teacher Unions, Arizona Parent Teacher Association, Arizona Rural Schools Association, Arizona School Administrators, Inc., Arizona School Boards Association, American Civil Liberties Union of Arizona, and People for the American Way, Plaintiffs/Appellants,

v.

Tom HORNE, in his capacity as Superintendent of Public Instruction, Defendant/Appellee,

and

Jessica Geroux, Andrea Weck, Kristina Peterson, Kimberly Wuestenberg, Edwin Rivera, and Mike and Shirley Okamura, Intervenors/Appellees.

No. 2 CA–CV 2007–0143.

Court of Appeals of Arizona, Division 2, Department B.

May 15, 2008.

Review Granted Oct. 28, 2008.

Miller, LaSota & Peters, PLC By Donald M. Peters and Wendy L. Kim, Arizona Center for Law in the Public Interest By Timothy M. Hogan, Phoenix, Thomas W. Pickrell, Mesa, Attorneys for Plaintiffs/Appellants.

Terry Goddard, Arizona Attorney General By William A. Richards and Chad B. Sampson, Phoenix, Attorneys for Defendant/Appellee.

Institute for Justice, Arizona Chapter By Timothy D. Keller and Jennifer M. Perkins, Tempe, Institute for Justice By William H. Mellor and Clark M. Neily III, Arlington, Virginia, Thomas A. Zlaket PLLC By Thomas A. Zlaket, Tucson, Attorneys for Intervenors/Appellees.

Udall, Shumway & Lyons, P.L.C. By Denise Lowell–Britt and Jessica S. Sanchez, Mesa, Attorneys for Amicus Curiae Arizona Council for Administrators of Special Education.

Perkins Coie Brown & Bain P.A. By Lee Stein and Elizabeth J. Kruschek, Phoenix, Attorneys for Amicus Curiae National School Boards Association.

## OPINION

VÁSQUEZ, Judge.

¶ 1 In this action challenging the constitutionality of two "school voucher" statutes, appellants Virgel Cain and other interested individuals and organizations (collectively, "Cain") appeal from a judgment on the pleadings in favor of appellee Tom Horne, in his capacity as State Superintendent of Public Instruction, dismissing all of Cain's claims with prejudice. Although we agree with part of the trial court's reasoning, for the follow-

ing reasons, we reverse and remand for further proceedings consistent with this decision.

## Facts and Procedural Background

¶ 2 In 2006, the Arizona legislature enacted House Bill 2676 and Senate Bill 1164, establishing respectively the Arizona Scholarships for Pupils with Disabilities Program (the "scholarship program"), codified at A.R.S. §§ 15–891 through 15–891.06, and the Arizona Displaced Pupils Choice Grant Program (the "grant program"), codified at A.R.S. §§ 15–817 through 15–817.07 and § 43–1032. Under the scholarship program, public-school students with a disability may transfer to a public or private, primary or secondary school, and the state will pay a scholarship up to the amount of basic state aid the student would generate for a public school district. §§ 15–891, 15–891.04. Under the grant program, the state will pay $5,000 or the cost of tuition and fees, whichever is less, for children who have been placed in foster care to attend a private primary or secondary school. §§ 15–817.02, 15–817.04. Under both programs (collectively, the "school voucher programs"), parents or legal guardians select the school their child will attend. The state then disburses grant funds to the parent or guardian, who must "restrictively endorse" the check or warrant for payment to the school. §§ 15–817.01, 15–891.03(F). Both sectarian and nonsectarian schools may participate in the school voucher programs, and schools are not required to alter their "creed, practices or curriculum" in order to receive the funding. §§ 15–817.07(B), 15–891.02, 15–891.05(B).

¶ 3 In February 2007, Cain filed a complaint in Maricopa County Superior Court, challenging the constitutionality of the school voucher programs and seeking to enjoin Horne from implementing them. He also filed an application for a preliminary injunction and a motion for summary judgment. After intervenors-appellees Jessica Geroux and other interested individuals ("Geroux") successfully moved to intervene, they moved to dismiss Cain's claims. Horne joined in Geroux's motion to dismiss and moved for judgment on the pleadings. The trial court granted Horne's motion, finding the school voucher programs did not violate the provisions of the Arizona Constitution cited by Cain, and dismissed all of Cain's claims with prejudice. We have jurisdiction of this appeal under A.R.S. § 12–2101(B) (appeal from final judgment) and § 12–2101(F)(2) (appeal from denial of injunctive relief).

## Discussion

### Standard of Review

¶ 4 "A motion for judgment on the pleadings tests the sufficiency of the complaint and should be granted if the complaint fails to state a claim for relief." *Emmett McLoughlin Realty, Inc. v. Pima County*, 203 Ariz. 557, ¶ 4, 58 P.3d 39, 40 (App.2002). When, as here, a plaintiff asserts a statute is facially unconstitutional,[1] the issue is a matter of law that may be resolved by a judgment on the pleadings. *See id.; Brown v. White*, 4 Ariz.App. 255, 257, 419 P.2d 385, 387 (1966) (judgment on pleadings improper when constitutional challenge to statute as applied raises genuine issue of fact).

¶ 5 We review the trial court's conclusions of law de novo. *Emmett McLoughlin Realty*, 203 Ariz. 557, ¶ 4, 58 P.3d at 40. In deference to the legislature, however, we begin with a presumption that the statute is constitutional. *Id.* "Indeed we have a duty to construe statutes in harmony with the constitution if it is possible to reasonably do so." *Martin v. Reinstein*, 195 Ariz. 293, ¶ 16, 987 P.2d 779, 788 (App.1999). But, in interpreting a constitutional provision, we "do not go outside the plain language of the provision unless the language is unclear," *Phelps Dodge Corp. v. Ariz. Elec. Power Coop., Inc.*, 207 Ariz. 95, ¶ 42, 83 P.3d 573, 587 (App. 2004); we "give words their natural, obvious and ordinary meaning unless defined otherwise in the constitution," *Ariz. Minority Coal. for Fair Redist'g v. Ariz. Indep. Re-*

---

1. Cain's complaint clearly states a facial challenge to the constitutionality of the statutes, alleging that "[t]he Voucher Statutes violate provisions in the Arizona Constitution that prohibit, among other things, appropriations of public money for religious instruction or in aid of private or sectarian schools."

*dist'g Comm'n,* 211 Ariz. 337, ¶ 52, 121 P.3d 843, 858 (App.2005); and we "give meaning to each word, phrase, clause, and sentence of the provision so that no part will be void, inert, redundant, or trivial," *In re Cameron T.,* 190 Ariz. 456, 460, 949 P.2d 545, 549 (App.1997).

■ ¶ 6 Here, Cain argues the school voucher statutes violate two distinct provisions of the Arizona Constitution. First, he contends the statutes violate article II, § 12 of the Arizona Constitution (the "Religion Clause"), which provides: "No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment." Second, he maintains the statutes are unconstitutional pursuant to the prohibitions in article IX, § 10 of the Arizona Constitution (the "Aid Clause"), read either alone or in conjunction with other constitutional provisions establishing a system of public education. The Aid Clause provides: "No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation." We note that although there may be some overlap between these clauses, the Religion Clause—Arizona's analog to the federal Establishment Clause— was intended to ensure the separation of church and state, whereas the Aid Clause— which has no equivalent in the United States Constitution—was aimed at placing restrictions on the disbursement of public funds to specified institutions, both religious and secular. *See Almond v. Day,* 197 Va. 419, 89 S.E.2d 851, 855, 858 (1955) (considering similar clauses in Virginia Constitution); *see also Kotterman v. Killian,* 193 Ariz. 273, ¶ 127, 972 P.2d 606, 638 (1999) (Feldman, J., dissenting) (noting article IX, § 10 based on "Arizona's strong policy of refusing to fund private or sectarian education"). And, while we analyze Cain's Religion Clause challenge according to Arizona precedent and in the light of federal Establishment Clause jurisprudence, the question of whether or when a program that directs state funds to private schools violates the Aid Clause is an issue of first impression.[2] *See generally Kotterman,* 193 Ariz. 273, 972 P.2d 606 (analyzing tax credit program under Religion Clause; not reaching issue of whether program constituted aid under Aid Clause).

### Religion Clause

¶ 7 In support of his argument that the school voucher statutes violate the Religion Clause, Cain relies primarily on *Witters v. State Commission for the Blind,* 112 Wash.2d 363, 771 P.2d 1119 (1989). There, the Washington Supreme Court held that an identical phrase in Washington's Constitution prohibited the state from providing financial assistance "to pay for a religious course of study at a religious school." *Id.* at 1121. Cain correctly points out that our supreme court has, for historical reasons, given substantial weight to the Washington Supreme Court's interpretations of sections of that state's constitution that are identical or very similar to our own. *See Faires v. Frohmiller,* 49 Ariz. 366, 372, 67 P.2d 470, 472 (1937), *superseded by statute as stated in Ward v. Stevens,* 86 Ariz. 222, 230, 344 P.2d 491, 496 (1959); *Schultz v. City of Phoenix,* 18 Ariz. 35, 42, 156 P. 75, 77 (1916).

¶ 8 However, our supreme court has specifically distanced itself from the Washington court's decisions as they apply to this partic-

2. The parties devote a significant portion of their briefs discussing the question whether the constitutional provisions at issue in this case are so-called "Blaine amendments." In 1875, Congressman James Blaine introduced an amendment to the United States Constitution prohibiting states from using public funds for the benefit of any religious sect. *See Kotterman v. Killian,* 193 Ariz. 273, ¶ 65, 972 P.2d 606, 624 (1999). It failed to pass, but similar amendments were subsequently made to a number of state constitutions. *Id.* Although the original Blaine amendment, and the amendments made to state constitutions in its immediate aftermath, may have been motivated by anti-Catholic bigotry, there is "no recorded history directly linking the amendment with Arizona's constitutional convention" thirty-five years later. *Id.* ¶ 66. Furthermore, the Aid Clause does not discriminate between secular and religious private schools. And, in any event, none of the parties has produced any authority suggesting we may disregard constitutional provisions merely because we suspect they may have been tainted by questionable motives. We thus agree with the position of the National School Boards Association, expressed in its amicus brief, that this question "is irrelevant to the resolution of this case."

ular shared provision in our constitutions. *Kotterman,* 193 Ariz. 273, ¶¶ 68–71, 972 P.2d at 624–25. Furthermore, the court's analysis of Arizona's constitution in *Kotterman, id.* at ¶ 46, and *Community Council v. Jordan,* 102 Ariz. 448, 451–52, 432 P.2d 460, 463–64 (1967),[3] suggests a position virtually indistinguishable from the United States Supreme Court's interpretation of the federal Establishment Clause. Applying that interpretation to an Establishment Clause challenge to the very educational funding at issue in *Witters,* the Supreme Court rejected the conclusion reached by the Washington court. *Witters v. Washington Dep't of Servs. for the Blind,* 474 U.S. 481, 485, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986).

¶ 9 In *Jordan,* our supreme court considered the constitutionality of state payments partially reimbursing the Salvation Army, a religious organization, for emergency welfare services it had provided to individuals and families under a contract with the Arizona Department of Public Welfare. 102 Ariz. at 450, 432 P.2d at 462. In upholding the payments, the court noted that the purpose of the Religion Clause was "to provide for the historical doctrine of separation of church and state, the thrust of which was to insure that there would be no state supported religious institutions." *Id.* at 451, 432 P.2d at 463. It thus concluded the Religion Clause was not intended to place a blanket prohibition on the channeling of public funds to religious institutions, but rather to prohibit "assistance in any form whatsoever which would encourage or tend to encourage the preference of one religion over another, or religion per se over no religion." *Id.* at 454, 432 P.2d at 466.

¶ 10 More recently, in *Kotterman,* the court considered a constitutional challenge, under both the United States and Arizona Constitutions, to a statute authorizing a state tax credit for donations to school tuition organizations.[4] 193 Ariz. 273, ¶ 1, 972 P.2d at

609–10. There the court stopped short of explicitly declaring that Arizona's Religion Clause is no more restrictive than the federal Establishment Clause. But it expressed skepticism that any historical analysis would show the framers had intended Arizona's provision to be more restrictive. *Id.* ¶¶ 53–54. Emphasizing "the range of choices reserved to taxpayers, parents, and children, [and] the neutrality built into the system," it found the tax credit did not violate Arizona's Religion Clause. *Id.* ¶ 46.

¶ 11 Furthermore, we note that the United States Supreme Court applied similar reasoning to an Establishment Clause challenge to Ohio's school voucher program:

> [W]here a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. A program that shares these features permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients. The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.

*Zelman v. Simmons–Harris,* 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). Like the Ohio program and the measures challenged in *Jordan* and *Kotterman,* the statutes at issue here are facially neutral and favor neither one religion over another nor religion over nonreligion. And, as in *Kotterman,* parents and children make an independent, personal choice to direct the funds to a particular school, which may be either religious or secular. We therefore concur with

---

3. Horne also cites *Pratt v. Arizona Board of Regents,* 110 Ariz. 466, 520 P.2d 514 (1974). However, *Pratt* is distinguishable from this case because it dealt with the one-time rental of a publicly owned stadium for a religious gathering. In any event, it essentially repeats the relevant analysis set forth in *Jordan.*

4. Under A.R.S. § 43–1089, a school tuition organization is defined as "a charitable organization ... that allocates at least ninety percent of its annual revenue for educational scholarships or tuition grants to children."

the trial court's finding that, "[a]s enacted, the State's school voucher programs do not result in an appropriation of public money for, or an application of public money to, any religious worship, exercise or instruction or to the support of any religious establishment in violation of Article 2, Section 12 of the Arizona Constitution."

### Arizona Constitution's Aid Clause

■ ¶ 12 However, as noted above, Arizona has another constitutional provision relevant to the disposition of this case. The Aid Clause prohibits any "appropriation of public money made in aid of ... private or sectarian school[s]." Ariz. Const. art. IX, § 10. And Cain argues the state's "disbursement of benefits" under the school voucher programs here does "precisely what [the Aid Clause] forbids," and contends the trial court erred in finding otherwise. The plain language of our state constitution requires us to agree. As Cain suggests, the best guide to what the Aid Clause means is what is says. And, although *Jordan* and *Kotterman*, the authorities on which Horne and Geroux rely, considered constitutional challenges based on this clause that to some extent foreshadowed the arguments presented here, the conclusions in both of those cases turned on facts clearly distinguishable from the facts of this case.[5]

¶ 13 In *Kotterman*, the court disposed of the Aid Clause challenge in a single paragraph, finding the tax credit there was neither an appropriation of public money nor the laying of a tax, questions not disputed in the current case. It thus did not reach the issue of whether the tax credit constituted "aid" to private or sectarian schools.[6] 193 Ariz. 273, ¶ 50, 972 P.2d at 621.

¶ 14 And in *Jordan*, where the state "aid" represented only forty percent of the Salvation Army's actual direct costs, our supreme court found that "[t]he encouragement, by partial reimbursement, of any person or organization to spend more than it will receive is hardly 'aiding' that person or organization on to a healthy financial future." 102 Ariz. at 454, 432 P.2d at 466. The court, expressly limiting its holding to the facts of that case, concluded that, under those facts, "where the state is paying less than the actual cost of food, lodging, clothing, transportation, cash assistance, laundry and clea[n]ing given to the destitute in emergency situations and paying nothing for administration, there is not an unconstitutional aiding of the conduit through which such things are made available." *Id.* at 456, 432 P.2d at 468.

¶ 15 Cain argues that any broader application of *Jordan* is inapposite. Pointing to the court's statement in *Jordan* that "[t]he 'aid' prohibited in the constitution of our state is ... assistance in any form whatsoever which would encourage or tend to encourage the preference of one religion over another or religion per se over no religion," he contends that statement makes little sense applied to the Aid Clause, because it would make the prohibition of aid to secular institutions in that clause redundant. 102 Ariz. at 454, 432 P.2d at 466. We agree and find this statement was not directed at the Aid Clause but merely reprises the court's analysis of the separation-of-church-and-state issues raised by the Religion Clause.

### The "True Beneficiary Theory"

■ ¶ 16 In *Jordan* the court applied the "true beneficiary theory" in holding "the pay-

---

5. It is not clear whether, in granting Horne's motion for judgment on the pleadings, the trial court also considered the existence of programs such as Arizona's program to implement the federal Individuals with Disabilities Education Act (IDEA), A.R.S. § 15–765; the Leveraging Educational Assistance Partnership (LEAP) program, A.R.S. § 15–1877(B); the Private Postsecondary Education Student Financial Assistance Program (PFAP), A.R.S. § 15–1854; and the Postsecondary Education Grant (PEG) program, A.R.S. § 15–1855. However, these programs are not at issue in the current case, and to the extent parties invite us to discuss their constitutionality, we decline to do so.

6. The parties dispute the precedential value of the court's statement in *Kotterman* that, "[e]ven if we were to agree that an appropriation of public funds was implicated here, we would fail to see how the tax credit ... violates this clause." 193 Ariz. 273, ¶ 46, 972 P.2d at 620. However, the "clause" under discussion was the Religion Clause and, dictum or not, this statement merely reiterates the court's finding that a program that is neutral with respect to religion does not violate that clause.

ments are made in effect from the state—not to the Salvation Army, but to those who actually profit from the disbursements—to the individuals and families who are destitute and receive the emergency aid." *Id.* at 455, 432 P.2d at 467. Under this theory—sometimes called the "child benefit theory" in the education context—the individuals receiving assistance under a government program are characterized as the "true beneficiaries" of the program, rather than the institution receiving public funds to render the assistance. *Id. Jordan* described the theory as one of several doctrines that enabled courts to "avoid holding that payments made by governmental authorities to sectarian and ecclesiastical bodies violate the separati[o]n of church and state." *Id.* Therefore, even if applied outside *Jordan's* specific facts, the court's use of the theory appears to be directed to the issue of "attaching religious conditions to [ ] aid," as Cain argues, and thus at the Religion Clause rather than the Aid Clause.

¶ 17 Moreover, even if we were to accept the argument that *Jordan* stands for a more general adoption of the "true beneficiary theory," we are not persuaded that the theory can be extended to the tuition payments under the school voucher programs. Although some states with constitutional provisions similar to our Aid Clause have applied the "true beneficiary theory" or similar reasoning to uphold programs providing textbooks and transportation to private-school students, others have found even this type of limited, narrowly defined aid to be an unconstitutional benefit to the schools themselves. *See Bowker v. Baker,* 73 Cal.App.2d 653, 167 P.2d 256 (1946) (transporting students does not aid private schools); *Chance v. Miss. State Textbook Rating and Purch'g Bd.,* 190 Miss. 453, 200 So. 706 (1941) (providing textbooks to students not aid to private schools); *State ex rel. Bouc v. Sch. Dist.,* 211 Neb. 731, 320 N.W.2d 472, 476 (1982) (providing transpor-

tation not a prohibited appropriation "to" nonpublic schools). *But see Matthews v. Quinton,* 362 P.2d 932 (Alaska 1961) (transporting students a direct benefit to private schools); *Cal. Teachers Ass'n v. Riles,* 29 Cal.3d 794, 176 Cal.Rptr. 300, 632 P.2d 953 (1981) (providing textbooks to students an unconstitutional appropriation for support of nonpublic schools); *Spears v. Honda,* 51 Haw. 1, 449 P.2d 130 (1968) (transportation subsidies to students violate constitutional prohibition against appropriating public funds for support or benefit of any private educational institution).

¶ 18 However, regardless of their position on transportation and textbooks, states with constitutional provisions similar to ours have uniformly rejected the notion that schools are not aided by tuition payments: [7]

> Assuming, but not deciding, the soundness of the view that the private institutions involved receive no direct benefit from the transportation of pupils or the furnishing of textbooks to them, the same cannot be said of provisions for the payment of tuition and institutional fees at such schools. Tuition and institutional fees go directly to the institution and are its very life blood. Such items are the main support of private schools which are not sufficiently endowed to insure their maintenance. Surely a payment by the State of the tuition and fees of the pupils of a private school begun on the strength of a contract by the State to do so would be an appropriation to that school.

*Almond v. Day,* 197 Va. 419, 89 S.E.2d 851, 856–57 (1955). And, in *Hartness v. Patterson,* 255 S.C. 503, 179 S.E.2d 907, 909 (1971), the South Carolina Supreme Court, applying a South Carolina constitutional provision that contains "in aid of" language similar to that in our Aid Clause, explained:

> We reject the argument that the tuition grants provided under the Act do not constitute aid to the participating schools.

---

7. Both of the cases cited by Geroux in support of the application of this theory here involved state constitutional challenges based on provisions that proscribed state funding for religious institutions but contained no general prohibition on aid to private schools. In *Jackson v. Benson,* 218 Wis.2d 835, 578 N.W.2d 602, ¶¶ 53–54 (1998), the Wisconsin Supreme Court found that a voucher program complied with "Wisconsin's equivalent of the Establishment Clause of the First Amendment." Similarly, in *Simmons–Harris v. Goff,* 86 Ohio St.3d 1, 711 N.E.2d 203, 211 (1999), the Ohio Supreme Court found a voucher program did not violate "the approximate equivalent of the Establishment Clause" in the Ohio Constitution.

Students must pay tuition fees to attend [these schools] and the institutions depend upon the payment of such fees to aid in financing their operations. *While it is true that the tuition grant aids the student, it is also of material aid to the institution to which it is paid.*

(Emphasis added.) *See also Sheldon Jackson Coll. v. State*, 599 P.2d 127, 130–31 (Alaska 1979) (tuition payments are substantial, and unconstitutional, benefit to school even when paid indirectly); *State ex rel. Gallwey v. Grimm*, 146 Wash.2d 445, 48 P.3d 274, 279 (2002) (tuition grants support educational institutions with public funds). And, both *California Teachers Ass'n*, 176 Cal.Rptr. at 307, 632 P.2d 953, and *Gaffney v. State Department of Education*, 192 Neb. 358, 220 N.W.2d 550, 556 (1974), concluded that a broad application of the "true beneficiary theory" would essentially nullify their respective states' constitutional prohibitions on state aid to private schools.

**Indirect Aid Prohibited**

¶ 19 Courts have also been reluctant to uphold otherwise unconstitutional legislation that channels state funds for private-school tuition payments through students, parents, or other intermediaries: "[T]he Legislature cannot circumvent an express provision of the Constitution by doing indirectly what it may not do directly. Here the grant is not directly to a private school but rather to a student, but it must be used for tuition at a private school." *State ex rel. Rogers v. Swanson*, 192 Neb. 125, 219 N.W.2d 726, 730 (1974). Even Alaska, whose constitution prohibits only "direct" aid to private schools, has concluded that "while a direct transfer of funds from the state to a private school will of course render a program constitutionally suspect, merely channeling the funds through an intermediary will not save an otherwise improper expenditure of public monies." *Sheldon Jackson Coll.*, 599 P.2d at 130–31.

¶ 20 In the present case, our legislature apparently intended to foreclose the argument that the school voucher programs give unconstitutional aid to private schools by including statutory language, such as that in

§ 15–817.01(B), stating that the public funds are a "grant of aid to a qualifying pupil through the qualifying pupil's respective custodian and not to the grant school in which the qualifying pupil is enrolled." However, we have an affirmative duty to independently review and interpret legislation and rule on its constitutionality. *See Martin v. Moore*, 61 Ariz. 92, 95, 143 P.2d 334, 335 (1943).

¶ 21 Horne concedes that, under the school voucher programs, state funds are sent directly to participating schools, albeit in the form of checks or warrants made payable to students' parents or legal guardians who must endorse them in favor of the school. But even if the mechanism for disbursing tuition payments were more circuitous, it would still transfer state-appropriated funds to private schools. *See Crozier v. Frohmiller*, 65 Ariz. 296, 299, 179 P.2d 445, 447 (1947) (legislature may not do indirectly what it cannot do directly). And the fact that public schools are included with private schools under the scholarship program does not change our conclusion. *See* § 15–891. "[I]t strikes us as meaningless to offer a [voucher] for tuition scholarships to schools that charge no tuition." *Kotterman*, 193 Ariz. 273, ¶ 25, 972 P.2d at 616.

¶ 22 Furthermore, applying the "true beneficiary theory" to uphold the school voucher programs would effectively make the Aid Clause of the Arizona Constitution redundant, since " 'practically every proper expenditure for school purposes aids the child.' " *Cal. Teachers Ass'n*, 176 Cal. Rptr. at 307, 632 P.2d 953, *quoting Gurney v. Ferguson*, 190 Okla. 254, 122 P.2d 1002, 1003 (1941). Horne's suggestion at oral argument that we should read the Aid Clause as only prohibiting payments made to schools with a donative, rather than a compensatory, intent would similarly render the clause superfluous; article IX, § 7 of the Arizona Constitution already prohibits the state from making "any donation or grant, by subsidy or otherwise, to any individual, association, or corporation" other than for a public purpose. *See Kotterman*, 193 Ariz. 273, ¶ 51, 972 P.2d at 621. In interpreting the constitution, we must avoid a construction that would render any part of it redundant. *See City of Phoe-*

*nix v. Yates,* 69 Ariz. 68, 72, 208 P.2d 1147, 1149 (1949).

¶ 23 We conclude, therefore, that the school voucher programs provide aid to private schools in violation of the Aid Clause, article IX, § 10, of the Arizona Constitution. We recognize that when "the legislature has clearly spoken on a matter within its domain, its word constitutes public policy on that subject and controls, assuming no constitutional impediments exist." *See Taylor v. Graham County Chamber of Commerce,* 201 Ariz. 184, ¶ 27, 33 P.3d 518, 525 (App.2001). But where our constitution has spoken, it is our duty to uphold it, *Kenyon v. Hammer,* 142 Ariz. 69, 74, 688 P.2d 961, 966 (1984), regardless of the "wisdom, necessity, propriety or expediency of the legislation in question," *Indus. Dev. Auth. v. Nelson,* 109 Ariz. 368, 371, 509 P.2d 705, 708 (1973). "The cardinal rule of constitutional construction is to follow the text and the intent of the framers." *Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 595, 790 P.2d 242, 250 (1990). Only by ignoring the plain text of the Arizona Constitution prohibiting state aid to private schools could we find the aid represented by the payment of tuition fees to such schools in this case constitutional. Of course, "if legislators wish to revive what is foreclosed by our constitutional ... text, they may propose a constitutional amendment. Should Arizona's citizens want to repeal our constitutional prohibitions, they may adopt such an amendment." *Kotterman,* 193 Ariz. 273, ¶ 132, 972 P.2d at 639 (Feldman, J., dissenting).

**General and Uniform Clause**

¶ 24 In his complaint, Cain specifically alleged that the school voucher statutes violated article II, § 12 and article IX, § 10. In subsequent proceedings below and on appeal, however, he also develops an argument based on the "combination" of the Aid Clause and other provisions regarding the "establishment and maintenance of a general and uniform public school system." Ariz. Const. art. XI, § 1. In support of this argument, he relies primarily on the Florida Supreme Court's decision in *Bush v. Holmes,* 919 So.2d 392 (Fla.2006), which found a Florida voucher program unconstitutional on similar grounds under that state's constitution. Although the trial court considered and rejected this argument, we "avoid addressing constitutional issues relating to a statute unless absolutely necessary to resolve a case." *Jeter v. Mayo Clinic Ariz.,* 211 Ariz. 386, n. 23, 121 P.3d 1256, 1273 n. 23 (App.2005). Because we find the school voucher statutes violate the aid prohibition in article IX, § 10, irrespective of any other provisions in the Arizona Constitution, we do not address this argument.[8]

**Disposition**

¶ 25 For the foregoing reasons, we vacate the trial court's judgment and remand with direction to enter judgment for Cain, enjoining Horne from expending public funds pursuant to the school voucher statutes. As the prevailing party, Cain is entitled to costs and attorney fees pursuant to A.R.S. § 35–213(C) upon compliance with Rule 21, Ariz. R. Civ. App. P.

CONCURRING: PETER J. ECKERSTROM, Presiding Judge and PHILIP G. ESPINOSA, Judge.

---

8. We note that the Florida Court of Appeals took an approach similar to ours in *Bush v. Holmes,* 886 So.2d 340, 345 (Fla.App.2004), striking down the statute on the basis of Florida's constitutional prohibition on aid to sectarian schools, rather than on its requirements that the state provide "a uniform, efficient, safe, secure, and high quality system of free public schools." *See Bush v. Holmes,* 919 So.2d 392, 413 (Fla.2006) ("We ... neither approve nor disapprove the [appellate court's] determination that the [voucher program] violates the 'no aid' provision in article 7, section 3 of the Florida Constitution, an issue we decline to reach.").