SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| VIRGEL CAIN, SANDY BAHR, SCOTT HOLCOMB, ARIZONA ASSOCIATION OF SCHOOL BUSINESS OFFICIALS, ARIZONA EDUCATION ASSOCIATION, ARIZONA FEDERATION OF TEACHER UNIONS, ARIZONA PARENT TEACHER ASSOCIATION, ARIZONA RURAL SCHOOLS ASSOCIATION, ARIZONA SCHOOL ADMINISTRATORS, INC., ARIZONA SCHOOL BOARDS ASSOCIATION, AMERICAN CIVIL LIBERTIES UNION OF ARIZONA, and PEOPLE FOR THE AMERICAN WAY, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Arizona Supreme Court No. CV-08-0189-PR  Court of Appeals Division Two No. 2 CA-CV 07-0143  Maricopa County Superior Court No. CV2007-002986 |
| Plaintiffs/Appellants, ) ) | |
| v. ) ) | **O P I N I O N** |
| TOM HORNE, in his capacity as Superintendent of Public Instruction, ) ) ) ) | |
| Defendant/Appellee, ) ) | |
| and ) ) | |
| JESSICA GEROUX, ANDREA WECK, KRISTINA PETERSON, KIMBERLY WUESTENBERG, EDWIN RIVERA, and MIKE and SHIRLEY OKAMURA, ) ) ) ) ) | |
| Intervenors/Appellees. ) ) | |
| _____ ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Bethany G. Hicks, Judge

**REVERSED AND REMANDED**
_____

MILLER, LASOTA & PETERS, P.L.C.                              Phoenix
     By   Donald M. Peters
          Wendy Lee Kim

And

THOMAS W. PICKRELL, ATTORNEY AT LAW                            Mesa
     By   Thomas W. Pickrell

And

ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST                Phoenix
     By   Timothy M. Hogan
Attorneys for Virgel Cain, Sandra Bahr, Scott Holcomb,
Arizona Association of School Business Officials,
Arizona Education Association, Arizona Federation of
Teacher Unions, Arizona Parent Teacher Association,
Arizona Rural Schools Association, Arizona School
Administrators, Inc., Arizona School Boards Association,
American Civil Liberties Union of Arizona, and People
for the American Way

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                     Phoenix
     By   Paula S. Bickett, Chief Counsel, Civil Appeals
          William A. Richards, Assistant Attorney General
          Chad B. Sampson, Assistant Attorney General
Attorneys for Thomas C. Horne, Superintendent of Public
Instruction

LAW OFFICES OF THOMAS A. ZLAKET, P.L.L.C.                    Tucson
     By   Thomas A. Zlaket

And

INSTITUTE FOR JUSTICE                                        Tempe
     By   Timothy D. Keller
          Jennifer M. Perkins
Attorneys for Jessica Geroux, Andrea Weck, Kristina
Peterson, Kimberly Wuestenberg, Edwin Rivera, Mike
Okamura and Shirley Okamura

```
PACIFIC LEGAL FOUNDATION                          Sacramento, CA
     By   James S. Burling
Attorneys for Amici Curiae Pacific Legal Foundation
and Arizona Autism Coalition


ARIZONA CENTER FOR DISABILITY LAW                        Tucson
     By   JoAnn Sheperd
Attorneys for Amicus Curiae Arizona Center for
Disability Law


George H. King                                        Chandler
Attorney for Amicus Curiae Chrysalis Academy
Parents Association


CENTER FOR ARIZONA POLICY                             Phoenix
     By   Cathi W. Herrod
          Peter A. Gentala
          Deborah M. Sheasby
Attorneys for Amicus Curiae Center for
Arizona Policy


WINSTON & STRAWN, L.L.P.                         Washington, DC
     By   Steffen N. Johnson
          Adéle H. Auxier


And


SCHARF-NORTON CENTER FOR CONSTITUTIONAL LITIGATION    Phoenix
     By   Clint Bolick
          Jackson Moll
Attorneys for Amici Curiae Alliance for School Choice,
American Legislative Exchange Council, Black Alliance
for Educational Options, Friedman Foundation for
Educational Choice, and The Hispanic Council for
Reform and Educational Options


DLA PIPER,(US) L.L.P.                                  Phoenix
     By   Cynthia A. Ricketts
Attorneys for Amicus Curiae Americans United
for Separation of Church and State


ORRICK, HERRINGTON & SUTCLIFFE, L.L.P.        San Francisco, CA
     By   Walter F. Brown, Jr.
          Raymond G. Mullady, Jr.              Washington, DC
          Lindsay E.G. Simmons


And
```

3

ALLIANCE DEFENSE FUND LAW CENTER                              Scottsdale
     By   Benjamin W. Bull
          Jeremy David Tedesco
Attorneys for Amicus Curiae Father's Heart
Christian School

SCHMITT, SCHNECK, SMYTH & HERROD, P.C.                         Phoenix
     By   Timothy J. Casey
Attorneys for Amicus Curiae The Becket Fund for
Religious Liberty
_____

**R Y A N**, Justice

¶1      Article 2, Section 12, of the Arizona Constitution provides that "[n]o public money . . . shall be appropriated to any religious worship, exercise, or instruction, or to the support of any religious establishment."  Article 9, Section 10, of the Arizona Constitution states that "[n]o tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation."  The issue before us is whether two state-funded programs violate these provisions of our constitution.

**I**

**A**

¶2      In 2006, the Legislature enacted two programs that, in part, appropriated state monies to allow students to attend a private school of their choice instead of the public school in the district in which they live.  *See* 2006 Ariz. Sess. Laws, ch. 340, §§ 1-2 (2d Reg. Sess.) ("Arizona Scholarship for Pupils

with Disabilities"); *id.*, ch. 358, §§ 1-4 (2d Reg. Sess.) ("The Displaced Pupils Grant Program"). The Legislature appropriated $2.5 million for each program. 2006 Ariz. Sess. Laws, ch. 340, § 2 (2d Reg. Sess.); *id.*, ch. 358, § 3 (2d Reg. Sess.).

¶3     The Arizona Scholarships for Pupils with Disabilities Program, codified at Arizona Revised Statutes ("A.R.S.") §§ 15-891 to 15-891.06 (Supp. 2008), offers "pupils with disabilities . . . the option of attending any public school of the pupil's choice or receiving a scholarship to any qualified school of the pupil's choice." A.R.S. § 15-891(A).[1] Under this program, a public-school student with a disability may transfer to a private primary or secondary school, with the State paying a scholarship up to the amount of basic state aid the student would generate for a public school district. *Id*. §§ 15-891, 15-891.04. A parent of a disabled student may apply for a scholarship if the pupil attended a public school during the prior school year, the parent "is dissatisfied with the pupil's progress," and "[t]he parent has obtained acceptance for admission of the pupil to a qualified school." *Id*. § 15-891(B)(1) & (2). A "'[q]ualified school' means a nongovernmental primary or secondary school or a preschool for handicapped students that is located in this state and that does

---

[1]     The portion of this statute permitting disabled students the option of attending a public school of their choice is not at issue in this case.

not discriminate on the basis of race, color, handicap, familial status or national origin." *Id*. § 15-891(F)(2). The program also requires school districts to notify parents of their options, including enrolling in another school in the district. *Id*. § 15-891.01(A).

¶4    The Arizona Displaced Pupils Choice Grant Program, codified at A.R.S. §§ 15-817 to 15-817.07 (Supp. 2008) and 43-1032 (Supp. 2008), allows the State to pay $5,000 or the cost of tuition and fees, whichever is less, for children in foster care to attend the private primary or secondary school of their choice.[2] *Id*. §§ 15-817.02, 15-817.04. The program is limited to 500 pupils. *Id*. § 15-817.02(C). A grant school is "a nongovernmental primary school or secondary school or a preschool . . . that does not discriminate on the basis of race, color, handicap, familial status or national origin, that maintains one or more grade levels from kindergarten through grade twelve . . . ." *Id*. § 15-817(3).

¶5    Sectarian and nonsectarian schools may participate in both programs; schools are not required to alter their "creed, practices or curriculum" in order to receive funding. *Id*. §§

---

[2]    A "grant school is not required to accept the grant as full payment for the educational and related services that [it] provides to that qualifying pupil and may charge the . . . pupil an additional amount representing the balance of the tuition and fees that remains payable after crediting the . . . pupil with the amount of the grant." A.R.S. § 15-817.03(B).

15-817.07(B), 15-891.02, 15-891.05(B). Under both programs, (collectively "the voucher programs") parents or legal guardians select the private or sectarian school their child will attend. *Id*. §§ 15-817.01(D), 15-891(B). The State then disburses a check or warrant to the parent or guardian, who must "restrictively endorse" the instrument for payment to the selected school. *Id*. §§ 15-817.05, 15-891.03(F).

**B**

¶6        Virgel Cain and others ("Cain") filed a complaint in Maricopa County Superior Court seeking to enjoin implementation of the voucher programs. Cain named Tom Horne, the superintendant of schools, as the defendant. Cain alleged that the voucher programs were facially unconstitutional under Article 2, Section 12, and Article 9, Section 10 of the Arizona Constitution. Horne and various intervenors moved for judgment on the pleadings, which the superior court granted, dismissing the complaint with prejudice.

¶7        On appeal, the court of appeals held that the voucher programs did not violate Article 2, Section 12. *Cain v. Horne*, 218 Ariz. 301, 306, ¶ 11, 183 P.3d 1269, 1274 (App. 2008). The court concluded, however, that the voucher programs violated Article 9, Section 10. *Id*. at 310, ¶ 23, 183 P.3d at 1278.

¶8        Horne and the intervenors petitioned for review, contending that the court of appeals erred in concluding that

the voucher programs violated Article 9, Section 10. Cain cross-petitioned for review, arguing that the court erred in holding that the voucher programs did not violate Article 2, Section 12.

¶9     We granted review of both petitions because this is a matter of first impression and of statewide importance. We exercise jurisdiction under Article 6, Section 5.3 of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

## II

### A

¶10     In interpreting a constitutional provision, "[o]ur primary purpose is to effectuate the intent of those who framed the provision." *Jett v. City of Tucson*, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994). In doing so, "we first examine the plain language of the provision." *Id*. (citation omitted). We do not depart from the language unless the framers' intent is unclear. *Fairfield v. Foster*, 25 Ariz. 146, 151, 214 P. 319, 321 (1923). "Each word, phrase, clause, and sentence must be given meaning so that no part will be void, inert, redundant, or trivial." *City of Phoenix v. Yates*, 69 Ariz. 68, 72, 208 P.2d 1147, 1149 (1949). When a provision is not clear, we can consider "the history behind the provision, the purpose sought to be accomplished by its enactment, and the evil sought to be remedied." *McElhaney Cattle Co. v. Smith*, 132 Ariz. 286, 290,

645 P.2d 801, 805 (1982) (citation omitted). "The provisions of [our] constitution are mandatory, unless by express words they are declared to be otherwise." Ariz. Const. art. 2, § 32.

**B**

¶11     The court of appeals referred to Article 2, Section 12 as the "Religion Clause." *Cain*, 218 Ariz. at 305, ¶ 6, 183 P.3d at 1273. The court reasoned that our decisions in *Kotterman v. Killian*, 193 Ariz. 273, 287, ¶ 46, 972 P.2d 606, 620 (1999), and *Community Council v. Jordan*, 102 Ariz. 448, 451-52, 432 P.2d 460, 463-64 (1967), suggest that Arizona's Religion Clause is "virtually indistinguishable from the United States Supreme Court's interpretation of the federal Establishment Clause." *Cain*, 218 Ariz. at 306, ¶ 8, 183 P.3d at 1274.

¶12     The Supreme Court's Establishment Clause jurisprudence has upheld programs that permit state funds to flow to religious institutions as a result of the genuinely independent and private choice of aid recipients. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 649 (2002) (distinguishing between aid to religious schools and "programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals"); *Witters v. Wash. Dep't of Servs. for Blind*, 474 U.S. 481, 487 (1986). Given its conclusion that the Religion Clause is coextensive with the federal Establishment Clause, the court of

9

appeals rejected Cain's Religion Clause arguments, noting that the voucher programs neither favor "one religion over another nor religion over nonreligion[,]" because "[the] parents . . . make an independent . . . choice to direct the funds to a particular school." *Cain*, 218 Ariz. at 306-07, ¶ 11, 183 P.3d at 1274-75.

¶13 The court of appeals described Article 9, Section 10, as the "Aid Clause." *Id*. at 305, ¶ 6, 183 P.3d at 1273. It noted that

> although there may be some overlap between these clauses, the Religion Clause – Arizona's analog to the federal Establishment Clause – was intended to ensure the separation of church and state, whereas the Aid Clause – which has no equivalent in the United States Constitution – was aimed at placing restrictions on the disbursement of public funds to specified institutions, both religious and secular.

*Id*. The court thus concluded that the "plain text" of the Aid Clause required it to find the school voucher programs violated that clause. *Id*. at 310, ¶ 23, 183 P.3d at 1278. It reached this conclusion in part because schools, whether sectarian or nonsectarian, are "aided by tuition payments." *Id*. at 308, ¶ 18, 183 P.3d at 1276.

C

¶14 Horne and the intervenors argue that the Aid Clause should be interpreted just as the United States Supreme Court has interpreted the Establishment Clause of the United States

10

Constitution, and that the parental choice involved in signing the state checks over to a private or sectarian school saves the voucher programs from unconstitutionality.

¶15    Horne first argues that the Aid and Religion Clauses must be interpreted similarly because our previous case law has considered them together.  *See Kotterman*, 193 Ariz. at 287-88, ¶¶ 46-50, 972 P.2d at 620-21; *Jordan*, 102 Ariz. at 451, 432 P.2d at 463.  *But see Pratt v. Ariz. Bd. of Regents*, 110 Ariz. 466, 468-69, 520 P.2d 514, 516-17 (1974) (considering Article 2, Section 12 in isolation).

¶16    Our only two cases addressing these clauses, however, did not correlate the two clauses as explicitly as Horne contends.  For example, *Kotterman* held only that tax credits for contributions to school tuition organizations were not appropriations of public money and therefore did not violate either clause.  193 Ariz. at 287-88, ¶¶ 44-50, 972 P.2d at 620-21.  Thus, the Court did not address any difference between the Religion Clause and the Aid Clause.  Similarly, although *Jordan* referred to both clauses, it focused on whether the state could contract with religious organizations to provide entirely non-denominational services to Arizona residents.  102 Ariz. at 451, 432 P.2d at 463 (stating that the issue before the Court was "whether the state . . . can choose to do business with and discharge part of its duties through denominational or sectarian

institutions without contravening constitutional prohibitions"). We held there that "[t]he 'aid' prohibited in the constitution of this state is . . . assistance in any form whatsoever which would encourage . . . the preference of one religion over another, or religion per se over no religion." *Id*. at 454, 432 P.2d at 466; *see also id*. at 456, 432 P.2d at 468 (stating that if the beneficiaries could not obtain aid without attending "chapel services," it "would render unconstitutional the payments . . . to the Salvation Army").

¶17     Contrary to Horne's assertion, *Kotterman* and *Jordan* do not compel us to interpret the Aid Clause as a mirror image of the Religion Clause or to interpret the Aid Clause as no broader than the federal Establishment Clause.  More importantly, both the text and purpose of the Aid Clause support the conclusion that the clause requires a construction independent from that of the Religion Clause.

¶18     First, the text of the Aid Clause encompasses more than does the Religion Clause.  The Aid Clause prohibits the use of public funds not only to aid *private* or sectarian schools, but to aid public corporations as well.  Ariz. Const. art. 9, § 10.  Thus, under the Aid Clause, a statute granting funds to aid a public service corporation engaged exclusively in secular activities might be prohibited; such a statute would pose no difficulties under the Religion Clause, nor could it be readily

12

analyzed under the Supreme Court's Establishment Clause jurisprudence. Likewise, the Religion Clause would prohibit an appropriation to pay for religious instruction in a public school, but the Aid Clause says nothing about such an appropriation, as public schools are not among the forbidden recipients of appropriations under the Aid Clause.

¶19 Second, although the two clauses overlap to some extent, they serve different purposes. The Religion Clause appears in Article 2, entitled "Declaration of Rights," and reinforces other provisions in the constitution "dealing with the separation of church and state." John D. Leshy, *The Arizona State Constitution: A Reference Guide* 52 (1993). The Aid Clause is found in Article 9, entitled "Public Debt, Revenue, and Taxation," and "[u]nlike [Article 2, Section 12] . . . prohibits public aid to private nonsectarian schools and to public service corporations." *Id.* at 216. The Aid Clause is thus primarily designed to protect the public fisc and to protect public schools.

¶20 The floor debates at the 1910 constitutional convention involved little discussion about these clauses. *The Records of the Arizona Constitutional Convention of 1910* 660, 894, 940 (John S. Goff ed., 1991) (hereafter "*Records*"). Nevertheless, those debates make clear that our framers considered public education of prime importance. *Records,*

13

*supra,* at 523-38, 945, 960 (discussing requirements for public education in Arizona); John D. Leshy, *The Making of the Arizona Constitution,* 20 Ariz. St. L.J. 1, 96 (1988). Indeed, the framers created a separate constitutional article on the subject. *See* Ariz. Const. art. 11, §§ 1-10.

¶21    The framers plainly intended that Arizona have a strong public school system to provide mandatory education. The Aid Clause furthers this goal by prohibiting appropriation of funds from the public treasury to private schools.

> [B]y prohibiting state financial support for any private school, whether or not it is religious in nature, article IX, section 10, seems designed . . . to help insure that the Arizona state legislature adequately meets its affirmative constitutional obligation under article XI, section 1 – an obligation found nowhere in the United States Constitution – to "provide for the establishment and maintenance of a general and uniform public school system."

Paul Bender et al., *The Supreme Court of Arizona: Its 1998-99 Decisions*, 32 Ariz. St. L.J. 1, 18 (2000).

**D**

¶22    Both the Aid and Religion Clauses prohibit certain appropriations of public money. In *Kotterman,* this Court addressed whether tax credits for contributions to organizations providing scholarships to students attending non-governmental schools violated the two clauses. 193 Ariz. at 276-77, ¶ 1, 972 P.2d at 609-10. We held that neither provision precluded the

14

Legislature from granting a tuition tax credit, because the tax credit was not an appropriation. "An appropriation earmarks funds from the general revenue of the state for an identified purpose or destination." *Id*. at 287, ¶ 45, 972 P.2d at 620 (internal quotations omitted); *see also League of Ariz. Cities & Towns v. Martin*, ___ Ariz. ___, ___, ¶ 15, 201 P.3d 517, 521 (2009) (defining appropriation). Because the funds in *Kotterman* were credits against tax liability, not withdrawals from the state treasury, the funds were never in the state's treasury; therefore, the credits did not constitute an appropriation. *Kotterman*, 193 Ariz. at 287, ¶ 45, 972 P.2d at 620.

¶23 Unlike the funds in *Kotterman*, the funds at issue here are withdrawn from the public treasury and earmarked for an identified purpose. *See Black & White Taxicab Co. v. Standard Oil Co.*, 25 Ariz. 381, 399, 218 P. 139, 145 (1923). Horne and the intervenors do not dispute that the vouchers therefore constitute appropriations of public funds. But, citing *Jordan*, they argue that the funds do not aid the schools; rather they characterize the funds as aid to students under a "true beneficiary" theory.

**E**

¶24 Under the true beneficiary theory, individuals benefitted by a government program, rather than the institution receiving the public funds, are characterized as the true

15

beneficiaries of the aid. For example, in *Jordan*, we held that using state funds to partially reimburse the Salvation Army's expenses in providing emergency aid to those in need did not violate the Aid Clause. 102 Ariz. at 454, 432 P.2d at 466 ("'Aid' in the form of partially matching reimbursement for only the direct, actual costs of materials given entirely to third parties of any or no faith or denomination and not to the church itself is not the type of aid prohibited by our constitution."). *Jordan* thus stands for the proposition that an entity covered by the Aid Clause may contract with the State to provide non-religious services to members of the public when such an entity "merely [acts as] a conduit and receives no financial aid or support therefrom." *Id*. at 456, 432 P.2d at 468.

¶25    The voucher programs, however, vary significantly from the program at issue in *Jordan*. In contrast to the program in *Jordan*, the voucher programs do not provide reimbursement for contracted services. *See id.* at 450, 432 P.2d at 462 (observing that payments by the State to the Salvation Army represented "relief expenditures made by the Salvation Army"). In fact, they are designed in such a way that the State does not purchase anything; rather it is the parent or the guardian who exercises sole discretion to contract with the qualified school. *See* A.R.S. §§ 15-817.01(A), 15-817.05, 15-891.03(F), 15-891.04(F). Moreover, as *Jordan* noted, when "the state is paying less than

16

the actual cost of food, lodging, clothing, transportation, cash assistance, laundry and cleaning given to the destitute in *emergency situations* and *paying nothing for administration*, there is not an unconstitutional aiding of the conduit through which such things are made available." 102 Ariz. at 456, 432 P.2d at 468 (emphasis added). The voucher programs do not have comparable limitations.

### F

¶26 The Aid Clause flatly prohibits "appropriation of public money . . . in aid of any . . . private or sectarian school." Ariz. Const. art. 9, § 10. No one doubts that the clause prohibits a direct appropriation of public funds to such recipients. For all intents and purposes, the voucher programs do precisely what the Aid Clause prohibits. These programs transfer state funds directly from the state treasury to private schools. That the checks or warrants first pass through the hands of parents is immaterial; once a pupil has been accepted into a qualified school under either program, the parents or guardians have no choice; they must endorse the check or warrant to the qualified school. *See* A.R.S. §§ 15-817.05, 15-891.04(F).

¶27 Thus, given the composition of these voucher programs, applying the true beneficiary theory exception would nullify the Aid Clause's clear prohibition against the use of public funds to aid private or sectarian education. *See Cal. Teachers Ass'n*

17

*v. Riles*, 632 P.2d 953, 960 (Cal. 1981) (finding that the true beneficiary doctrine would justify any type of aid to sectarian schools because "practically every proper expenditure for school purposes aids the child") (internal citation omitted); *Gaffney v. State Dep't of Educ.*, 220 N.W.2d 550, 556 (Neb. 1974) (examining a similarly worded "aid" clause and holding that application of the true beneficiary theory "would lead to total circumvention of the principles of our [state] Constitution"); *cf. Hartness v. Patterson*, 179 S.E.2d 907, 909 (S.C. 1971) (rejecting argument that tuition grants "do not constitute aid to the participating schools" and noting that "[although] tuition grant[s] aid[] the student, [they are] also of material aid to the institution to which it is paid").

¶28      In sum, the language and purpose of the Aid Clause do not permit the appropriations these voucher programs provide; to rule otherwise would allow appropriations that would amount to "aid of . . . private or sectarian school[s]," Ariz. Const. art. 9, § 10, and render the clause a nullity.[3]

---

[3]      With respect to the Displaced Pupils Choice Grants Program, the Legislature stated that "[a] grant . . . constitutes a grant of aid to a qualifying pupil through the pupil's respective custodian and not to the grant school."  A.R.S. § 15-817.01(B). We are not bound by such statements; it is our obligation to decide if legislation violates the constitution.  *See Chevron Chem. Co. v. Superior Court*, 131 Ariz. 431, 440, 641 P.2d 1275, 1284 (1982) (citing *Ogden v. Blackedge*, 6 U.S. (2 Cranch) 272, 277 (1804)).  The Legislature made no such statement as to the Arizona Scholarships for Pupils with Disabilities Program.

18

**G**

¶29      The voucher programs appear to be a well-intentioned effort to assist two distinct student populations with special needs.  But we are bound by our constitution.  There may well be ways of providing aid to these student populations without violating the constitution.  But, absent a constitutional amendment, because the Aid Clause does not permit appropriations of public money to private and sectarian schools, the voucher programs violate Article 9, Section 10 of the Arizona Constitution.[4]

**III**

¶30      Cain requests attorneys' fees under A.R.S. § 35-213 (2000).  Under this statute, taxpayers are entitled to bring an action on behalf of the state if (1) they request that the Attorney General bring the action on the citizens' behalf and wait sixty days to determine whether the Attorney General will heed the request, (2) they are taxpayers in the State of Arizona, and (3) they execute a bond payable to the defendant in the action and prosecute the action with "diligence and finality."  *Id*.  If the taxpayer prevails in the action "the court shall allow him costs and reasonable attorney's fees, not

---

[4]      Because we conclude that these programs violate the Aid Clause, we need not address Cain's cross-petition for review challenging the court of appeals' conclusion that these programs did not violate Article 2, Section 12.

19

to exceed forty per cent of the amount recovered or saved to the state, as the case may be." *Id*. § 35-213(C).

¶31     In this case, Cain and the other plaintiffs satisfied all statutory requisites.  Once this matter is final, they must be reimbursed for their expenses and reasonable attorneys' fees not to exceed forty per cent of the amount saved by the State by way of this action.  *See id*.

### IV

¶32     For the foregoing reasons, we reverse the judgment of the superior court and vacate the court of appeals' opinion.  We remand to the superior court for further proceedings consistent with this opinion.[5]

---

_____
                    Michael D. Ryan, Justice

CONCURRING:


_____
Rebecca White Berch, Vice Chief Justice


_____
Andrew D. Hurwitz, Justice

---

[5]     On June 27, 2008, we granted the intervenors' "Motion for Order Preserving Status Quo" to permit the Superintendent of Public Instruction to continue to fund the voucher programs as to children who participated in the programs during the 2007-2008 school year and who applied to participate in the programs for 2008-2009.  This opinion does not affect that order.

_____
W. Scott Bales, Justice


_____
Ann A. Scott Timmer, Chief Judge*


*Chief Justice Ruth V. McGregor has recused herself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Ann A. Scott Timmer, Chief Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.