432 P.2d 460

**COMMUNITY COUNCIL, an Arizona non-profit corporation, Petitioner,**

v.

**Jewel W. JORDAN, State Auditor and Jack Williams, Governor of the State of Arizona, Respondents.**

No. 9024.

Supreme Court of Arizona,
In Banc.

Oct. 18, 1967.

Ryley, Carlock & Ralston, by Joseph P. Ralston, Phoenix, for petitioner.

Darrell F. Smith, Atty. Gen., Sandra D. O'Connor, Phoenix, Asst. Atty. Gen., for respondents.

LOCKWOOD, Justice:

Community Council, an Arizona non-profit corporation and petitioner, sought an order for writ of mandamus compelling Jewel W. Jordan, Arizona State Auditor, and Jack Williams, Governor of the State of Arizona, to approve certain vouchers. representing reimbursement to the petitioner for the State Welfare Department's share of relief expenditures made by the Salvation Army. On June 23, 1967 we ordered that a peremptory writ of mandamus issue and this opinion follows in conformity therewith.

Such expenditures were made under authority of and pursuant to a contract between the Department of Welfare and the Community Council for the purpose of promoting the "coordination of community resources into a *central intake process* to eliminate duplication and overlapping and to channel available community funds to direct financial aid in emergency situations". (Emphasis supplied.)

Under the terms of the contract, petitioner was to designate a "representative financial assistance or transient aid committee" which must include a representative of the Maricopa County Department of Public Welfare. This committee, along with at least the United Fund Social Service Agencies and the Phoenix Council of Churches, was to designate one agency as a central referral center for purpose of emergency assistance to those in need. The Salvation Army was chosen as this central agency.

The contract stipulated that these same agencies and churches on the financial assistance or transient aid committee must agree to divert whatever direct assistance funds possible through the committee to the designated central agency, and that this central agency must agree to report monthly receipts to the Department of Welfare identifying the funds received and the agency or source from which derived.

As well, the designated central agency was obligated to furnish such reasonable statistics to the Department of Welfare as. needed, including at least "the monthly count of families aided, the household composition, approximate or estimated value of assistance given in kind, and the actual expenditure of funds for cash, clothing, gasoline, etc.".

The Department of Public Welfare admitted in the contract that it considers that the persons helped by the designated central agency would, to a greater or lesser degree, have cost the Department some of its emergency relief funds if there was not such a system of central intake functioning. Recognizing this, and in order to avoid a flat grant and to stimulate contributions, the Department agreed to a matching procedure whereby it would put up $1.00 (40%) for every $2.50 spent by the designated central agency, provided that the agreement would be subject to the status of appropriated funds and that the Commissioner of Public Welfare would exercise sole judgment as to the extent and availability of such funds.

Further, the contract provided that either party may withdraw from the agreement upon thirty days notice in writing to the other party. The Department was to continue to provide emergency assistance in those categories for which it had responsibility and which were not covered by the policies of the "central intake process". The Community Council Committee was required to meet at least once each three

months to evaluate the progress of this project.

The contract, approved as to form by the Arizona Attorney General's office, became effective as of July 1, 1965.

On May 24, 1967, the Welfare Department submitted to the respondent Jordan, as it had done in the past, vouchers representing claims pursuant to the above contract. The claims, presented by the Community Council and assigned to the Salvation Army, represented 40% reimbursement for the supplying of food, lodging, clothing, cash assistance, transportation, laundry and cleaning for the month of April, 1967, and totaled $5,399.17.

Respondent Jordan rejected the claims on the same day for the reason that said payment would be in conflict with the constitution of the State of Arizona.[1] The claims were resubmitted the next day and again rejected the same day by respondent Jordan.

Under the provisions of A.R.S. § 41–141 (Supp.1966) respondent Jordan submitted the claims to respondent Williams, Governor of the State of Arizona. On May 25, 1967, the Governor "returned without approval of said claims in whole or in part".

▪ The refusal of the respondents to allow these same claims which were admittedly properly itemized and approved by the authorized employee of the Department of Public Welfare fulfills the jurisdictional requirement for the commencement of an action for a writ of mandamus in this Court. Hutchins v. Frohmiller, 55 Ariz. 522, 103 P.2d 956 (1940); Ariz.Const. Art. VI, § 5, subsec. 1 (Supp.1966); A.R.S. § 12–2021 (1956); A.R.S. § 41–141 (Supp. 1966).

The respondents have conceded that their duties are purely ministerial with respect to the claims at issue, provided the expenditure is not prohibited by the Arizona Constitution.

The relevant constitutional provisions under which this question must be decided are as follows: Ariz.Const. Art. II, § 12 the relevant part of which states:

"No public money or property shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment."

And Ariz.Const. Art. IX, § 10 which provides:

"No tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation."

The issue placed in its proper perspective is whether the state or any of its agencies can choose to do business with and discharge part of its duties through denominational or sectarian institutions without contravening constitutional prohibitions.

▪ The respondents would have us adopt for this case of first impression the strict view that in essence no public monies may be channeled through a religious organization for any purpose whatsoever without, in fact, aiding that church contrary to constitutional mandate. We do not agree that such was the intent of the framers of the above cited constitutional provisions. The prohibitions against the use of public assets for religious purposes were included in the Arizona Constitution to provide for the historical doctrine of separation of church and state, the thrust of which was to insure that there would be no state supported religious institutions thus precluding governmental preference and favoritism of one or more churches. But the doctrine of separation of church and state does not include the doctrine of total nonrecognition of the church by the state and of the state by the church. The state constitutional provisions must be viewed in light of contemporaneous assumptions concerning the appropriate sphere of action for each institution. History is clear that as a state evolves from one decade to

1. Ariz.Const. Art. II, § 12 and Art. IX, § 10, A.R.S.

another the role of the state "transcends traditional boundaries and assumes new dimensions" necessitating a revision of the idiomatic meaning of "separation" to align it with "the new realities if original purposes and expectations are to be realized". See Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, 80 Harvard Law Review 1381, 1383 (May, 1967). Nor do we agree that the decisions of the courts in this nation necessarily lead to the conclusion that the respondents ask us to reach in the instant case.

A review of the cases relied upon as authority by both petitioner and respondent, along with other relevant cases is instructive here. Significant is the development of the law in Illinois. In the case of Cook County v. Chicago Industrial School for Girls, 125 Ill. 540, 18 N.E. 183, 1 L.R.A. 437 (1888), the Illinois court held that a statute allowing money to be paid by the State to a Catholic institution for the full tuition and maintenance of dependent girls committed by the county court was violative of Ill. Const. Art. 8, § 3, S.H.A. which prohibits appropriation of public moneys in aid of any church or any sectarian purpose.[2]

■ Among the arguments porposed in Cook was one similar to an argument offered by the petitioner in the case before the bar: contributions in way of reimbursement to an ecclesiastical institution for valid services rendered to recipients of state support merely relieves the state of a burden that it would otherwise have to bear

by substituting the organization for the state. This court will refer to such an argument as the "Doctrine of Substitution". It has also been called the "Value Received Theory" as the state receives "value" in the form of aid to the destitute which it has a burden to support. The Illinois court rejected this argument on the ground that the ultimate logical conclusion is that all education could be turned over to sectarian institutions on this basis and be validly supported by state contributions. We also reject the "Doctrine of Substitution" or "Value Received Theory" for this same reason.

The argument insofar as it advances the "Value Received Theory" in this case also fails to reach the issue before this Court. The question before us is not whether the motive behind such appropriation and the effect thereof is to *aid the state* by giving it value for its contribution or by relieving it of a burden; instead the question is simply does such appropriation unconstitutionally *aid the respective church?*

■ The Illinois case also demonstrates another view which we shall call the "Full Reimbursement Plan". An important distinction to be made between the *Cook* case and the case before us at this time is the quantum of reimbursement made by the state. In *Cook,* the state reimbursed the Catholic school a *full 100%* of the actual cost. In the case before the bar, the state contracted to reimburse only 40% of the actual costs.[3] This, of course, is important

2. Section 3 of Article 8 was quoted as follows: "Neither the general assembly, nor any county, city, town, township, school-district, or other public corporation, shall ever make any appropriation, or pay from any public fund whatever, anything in aid of any church or sectarian purpose, or to help support or sustain any school, academy, seminary, college, university, or other literary or scientific institution, controlled by any church or sectarian denomination whatever; nor shall any grant or donation of land, money, or other personal property, ever be made by the state, or any such public corporation, to any church, or for any sectarian purpose."

18 N.E. at 184. The words of the provision are still the same. See Smith-Hurd, Ill.Ann.Stat., Const. Art. 8, § 3 (1964).

3. It has been stipulated by the parties that the amount billed for "food—family services" represents the direct cost to the Salvation Army of purchasing the food, and reflects nothing for handling, preparation, serving or overhead. The same applies for the amount billed "food—Emergency Shelter". The amounts billed for "cash assistance", "transportation", "clothing", and "laundry and cleaning" represent only direct costs to the Salvation Army of providing these items. However, "the amount billed for 'lodging' is

in determining whether or not the appropriation does in fact "aid" the religious institution. The Illinois court itself has used this important distinction to reach conclusions contrary to *Cook*. In Dunn v. Chicago Industrial School for Girls, 280 Ill. 613, 117 N.E. 735 (1917), upon facts similar to *Cook*, the court held that the payment of money to the Catholic institution by a county for tuition and maintenance of children committed to the institution as wards of the state, was not a violation of Ill.Const. Art. 8, § 3, where the reimbursement was less than the actual cost of maintenance and tuition. In reaching this conclusion the court said:

> "If there were no difference, in fact, between the business of the boarding house or hotel keeper carried on for profit and this institution the decision in that case [Cook County v. Chicago Industrial School] would apply, *but upon the plainest grounds no aid is given to an industrial school where the payment is less than the actual cost,* aside from and regardless of any religious instruction or religious exercise. It costs the state $28.88 per month for each girl in a similar institution maintained by the state, *and it is the state, and not the industrial school, that is benefited by the payment of less than the cost* of food, clothing, medical care, and attention, and education and training in the useful arts and domestic science. Such payment does not violate any provision of the Constitution." 280 Ill. at 619, 117 N.E. at 737. (Emphasis supplied.)

■ Dunn v. Industrial School has been followed by Illinois in subsequent cases using the "Less Than Cost" doctrine. Dunn v. Addison Manual Training School for Boys, 281 Ill. 352, 117 N.E. 993 (1917); Trost v. Ketteler Manual Training School for Boys, 282 Ill. 504, 118 N.E. 743 (1918); St. Hedwig's Industrial School for Girls

v. Cook County, 289 Ill. 432, 124 N.E. 629 (1919). See also Murrow Indian Orphans Home v. Childers, 197 Okl. 249, 171 P.2d 600 (1946), where a contract required the State of Oklahoma to pay $70.00 a year per orphaned or dependent child for care by a Baptist Orphans Home when actual cost was $225.00–$250.00 per annum. The court upheld the contract upon a value received theory based on a less than cost rational.

■ The logic of the original *Dunn* case was considered and rejected in the forty-five year old Georgia case of Bennett v. City of La Grange, 153 Ga. 428, 112 S.E. 482, 22 A.L.R. 1312 (1922). *Bennett* is of special note here as it involved payments to the Salvation Army by a municipal corporation as reimbursement to the organization for money actually spent and expended in "relieving the suffering and necessities of certain poor and needy people within the city of La Grange". The Salvation Army was to submit monthly itemized statements of the actual cost of such service and the City of La Grange would give full reimbursement up to a maximum of $75.00 per month. For convenience and analysis we call such an arrangement the "Limited Full Reimbursement Plan".

The *Bennett* court rejected the original *Dunn* case on the basis that even though the cost to the government may be less than actual expenses, this nevertheless gives a "great advantage and the most substantial aid to the Salvation Army in the prosecution of its benevolent and religious purposes. The giving of loaves and fishes is a powerful instrumentality in the successful prosecution of the work of a sectarian institution". 153 Ga. at 437, 112 S.E. at 486–487. We most heartily agree with the majority decision in *Bennett* that whether it be full reimbursement or less than full reimbursement, "aid" in fact has been

---

computed at the rate of $1.75 per night per bed. * * * The figure of $1.75 was informally agreed upon by the Department of Public Welfare and the Salva-

tion Army as the cost to the Salvation Army of providing linen, laundry, bed and maintenance".

given to the religious organization. But contrary to the *Bennett* majority we also agree with the single sentence dissent in the case stating this type of "aid" is *not* the type of "aid" prohibited by the constitutional provision of Georgia[4] which is similar and somewhat narrower than our own constitutional provisions.

"Aid" in the form of partially matching reimbursement for only the direct, actual costs of materials given entirely to third parties of any or no faith or denomination and not to the church itself is not the type of aid prohibited by our constitution. The "aid" prohibited in the constitution of this state is, in our opinion, assistance in any form whatsoever which would encourage or tend to encourage the preference of one religion over another, or religion per se over no religion. We also hold that in order to fulfill the original intent of the constitution, the word "aid" like the word "separation" must be viewed in the light of the contemporary society, and not strictly held to the meaning and context of the past.

As a group, those cases with similar constitutional provisions which involve the "Full Reimbursement Plan" or the "Limited Full Reimbursement Plan" and which base their holding of unconstitutionality upon such a plan are to be distinguished from the case at bar wherein is followed what we choose to call the "Partially Matching Plan". The encouragement, by partial reimbursement, of any person or organization to spend more than it will receive is hardly "aiding" that person or organization on to a healthy financial future and in fact, may tend to preclude any future at all. If the Salvation Army were compelled by the state to enter into this contract contrary to its desires and on the same terms, the contract would unconstitutionally "aid" other religions not forced to operate at a loss. In the instant case the partial reimbursement of $1.00 for every $2.50 spent for governmental purposes, excluding any administrative expenses incurred therein, is hardly a profitable offer. There are two "dangers" in the "Limited Full Reimbursement Plan" and especially in the "Full Reimbursement Plan": (1) The reimbursement may cover not only actual costs, but may also include costs of employee salaries for labor and services performed. Reimbursement of employee costs is clearly an aid to the secular institution. See Cook County v. Chicago Industrial School for Girls, supra; Dakota Synod of Dakota v. State, 2 S.D. 366, 50 N.W. 632, 637, 14 L.R.A. 418 (1891); Williams v. Board of Trustees, Stanton Common School Dist., 173 Ky. 708, 191 S.W. 507, L.R.A.1917D, 453 (1917); (2) Not all of the recipients of the emergency aid will qualify for state welfare. These "dangers" are obviously lessened, if not fully negated, by only reimbursing less than one-half of actual direct costs.

As to the first danger in relation to this case, it might be argued that reimbursement of employee costs can be inferred from the "maintenance" charge under "lodging". See *footnote 3, supra.* The evidence presented does not lead us to that conclusion. As to the second "danger", the petitioner indicates that over a sustained period of time there should be no less than 40% of the recipients that would qualify for state welfare. This assertion is offered to justify the lack of a screening of the destitute applicants as to meeting minimum requirements for obtaining emergency relief. To this end the respondents "concede that at least some of the recipients of Salvation Army welfare relief would have received financial aid from state welfare funds had application been made to the Welfare Department". The above percentage may or may not be accurate as to the *number* of qualifying applicants. What should be noted however, is that the reim-

---

4. Paragraph 14 of section 1 of article i of the Constitution of Georgia is as follows: "No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religionists, or of any sectarian institution." Civil Code, § 6370. 153 Ga. at 431, 112 N.E. at 484

bursement is authorized on the basis that at least 40% of the actual direct *cost* meets the Welfare Department's emergency relief requirements. Thus, it is conceivable that in any one period even though there are 40% of the people who would qualify for state emergency relief, the cost of providing for these people may be *less* than 40%. Nevertheless, the Welfare Department would be required to pay 40% under the contract. Notwithstanding such a possibility, this court is of the opinion that the emergency nature of the aid required to be rendered dictates a practical approach to a practical problem. There is neither time nor personnel sufficient to make a completely accurate adjustment. This is emphasized in light of the fact that much of the aid is given during the evening and on weekends when the Department of Public Welfare is closed. Further, a lengthy interview followed by an investigation and a subsequent authorization is not compatible with the speed that an emergency situation demands. If enough time and care is taken to determine that a bona fide emergency does exist and that reasonable standards are used in making this determination, this is sufficient under the circumstances.

██ In an effort to avoid holding that payments made by governmental authorities to sectarian and ecclesiastical bodies violate the separation of church and state doctrine, courts throughout the nation have developed other doctrines besides those already mentioned. For example, at least one court has held that only appropriations of the legislature itself could violate their state constitutions. Schade v. Allegheny County Institution District, 386 Pa. 507, 126 A.2d 911 (1956). Cf. Almond v. Day, 197 Va. 419, 89 S.E.2d 851 (1955). Using this reasoning, it could be urged that both of the Arizona constitutional provisions quoted above and which speak of "appropriations" are to be interpreted narrowly to state legislative appropriations only and not to executive and administrative contracts and disbursements. We reject such a construction as clearly specious.

██ Another doctrine used prominently in decisions involving educational problems is the "Child Benefit Theory". See Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930); Borden v. Louisiana State Board of Education, 168 La. 1005, 123 So. 655, 67 A.L.R. 1183 (1929). Cf. Almond v. Day, 197 Va. 419, 89 S.E.2d 851 (1955); Gurney v. Ferguson, 190 Okl. 254, 122 P.2d 1002 (1942); Judd v. Board of Education, 278 N.Y. 200, 15 N.E.2d 576, 118 A.L.R. 789 (1938). Briefly, the theory is that it is not the school or sectarian institution that is receiving the benefits of the appropriation but the child itself. Placing this theory in the present adult-child context of the case before us, we choose to more accurately call the doctrine the "True Beneficiary Theory". Counsel for the state has effectively conversely used this argument for the respondents and has asked that we follow our decision in Pima County v. Anklam, 48 Ariz. 248, 61 P.2d 172 (1936). In this case the county paid funds to a hospital, which in turn paid the funds to a doctor. This court regarded the payments as having been made in effect directly from the county to the doctor. The respondents analogize that in the payment of funds from the state to the Community Council and from the Community Council to the Salvation Army, this court should look through any legal subterfuge, even though honestly conceived, in tracing public money to the Salvation Army. See Collins v. Kephart, 271 Pa. 428, 117 A. 440 (1921). Following counsel's suggestion, we shall ignore those who are not in fact the real or true beneficiaries and we hold that the payments are made in effect from the state—not to the Salvation Army, but to those who actually profit from the disbursements—to the individuals and families who are destitute and receive the emergency aid.

However, this court is cognizant of the fact that the aid is not rendered in a vacuum. Those who apply for and receive aid realize more or less that it comes through a religious organization. The Salvation Army is an arm of the Christian Church. It has been held that the Salvation Army is a sectarian institution. Bennett v. City of La Grange, supra. Further, those receiving the aid probably do not realize that a major portion of the help is financed by the state. But it is to be noted that participation in a specific religion is not a requirement to obtaining aid. No Salvation Army literature or pamphlets are displayed or distributed at the Welfare Center. A few pictorial representations of Jesus Christ are displayed, as well as a few signs concerning chapel services at 6:00 P.M. daily. Attendance at the chapel services, which are conducted by ministers of various churches in the community on a rotating basis, is voluntary. The mass feeding facility at the Emergency Shelter is opened at 6:30 P.M. immediately adjacent to the chapel and may be entered from doors opening from the chapel itself, or from a door leading to the main entry from the street. All persons physically presenting themselves at the mass feeding facility are given a meal cafeteria style on a first come, first served basis. No one is required to identify himself or to make application or answer any question as a condition precedent to obtaining food at this facility. Attendance at chapel services is not a condition precedent to obtaining food, although persons attending chapel services secure prior entry into the mass feeding facility. Of course, if for any reason those not attending chapel services could not obtain food, this would immediately raise the question of religious preference at the expense of the state, and render unconstitutional the payments through the Community Council to the Salvation Army.

A different facility housed at the Welfare Center is the Harbor Light Alcoholic Center. Persons in need of assistance are asked to complete an application form. This form asks, inter alia, what the individual's religious preference is, if any. The information obtained is used in attempting to obtain further assistance for the applicant and for statistical purposes. Assistance is not refused to persons who have no religious affiliation, nor to persons of any particular religious affiliation.

In summary, there appear to be two major philosophies: those who would have no public funds given to a sectarian organization at all, notwithstanding the fact that the organization is merely a conduit and receives no financial aid or support therefrom, and those who would take a more practical look at the facts and circumstances of each individual case and realistically analyze the situation to see if there is any violation of state or federal constitutional prohibitions. The theories and doctrines discussed above are used to support one view or the other. We hold that the constitutional prohibitions against furnishing aid or support to any religious worship, exercise or instruction, and against using public funds to aid any church or private or sectarian school or public service corporation must be rigidly enforced in context of the contemporary fabric of our society and in light of its needs. However, under the facts in this case, where the state is paying less than the actual cost of food, lodging, clothing, transportation, cash assistance, laundry and cleaning given to the destitute in emergency situations and paying nothing for administration, there is not an unconstitutional aiding of the conduit through which such things are made available.

BERNSTEIN, C. J., McFARLAND, V. C. J., and STRUCKMEYER, and UDALL, JJ., concur.