310 P.3d 983

Sharon NIEHAUS; Arizona School Boards Association; Arizona Education Association; and Arizona Association of School Business Officials, Plaintiffs/Appellants,

v.

John HUPPENTHAL, in his capacity as Arizona Superintendent of Public Instruction, Defendant/Appellee.

Goldwater Institute; Andrea Weck Robertson; Victoria Zicafoose; and Crystal Fox, Intervenors/Appellees.

No. 1 CA–CV 12–0242.

Court of Appeals of Arizona, Division 1, Department D.

Oct. 1, 2013.

LaSota & Peters, PLC by Donald M. Peters, Arizona Center for Law in the Public Interest by Timothy M. Hogan, Phoenix, Attorneys for Appellants.

Thomas C. Horne, Arizona Attorney General, by Kevin D. Ray, Jinju Park, Jordan T. Ellel, Phoenix, Attorneys for Appellee.

Scharf–Norton Center for Constitutional Litigation by Clint Bolick, Carrie Ann Sitren, Taylor C. Earl, Phoenix, Attorneys for Intervenor/Appellee Goldwater Institute.

Institute for Justice by Timothy D. Keller, Paul V. Avelar, Tempe, Attorneys for Parent Intervenors/Appellees.

DeConcini McDonald Yetwin & Lacy, P.C. by Denise M. Bainton, Tucson, National School Boards Association by Francisco M. Negrón, Jr., Virginia, Attorneys for Amicus Curiae.

## OPINION

THOMPSON, Judge.

¶ 1 Appellants Sharon Niehaus and other interested organizations (collectively, Niehaus) appeal the trial court's judgment denying their request for injunctive relief and granting judgment to appellee John Huppenthal (Huppenthal), in his capacity as Arizona State Superintendent of Public Instruction. Niehaus challenges the constitutionality of the Arizona Empowerment Scholarship Accounts program (ESA). For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶ 2 In 2011, the Arizona Legislature passed Senate Bill 1553, establishing the ESA, codified at Arizona Revised Statutes (A.R.S.) sections 15–2401 through –2404, to provide education scholarships to students with disabilities. The purpose of the ESA is "to provide options for the education of students in this state." A.R.S. § 15–2402(A). To qualify, a student must have a recognized disability, and have either attended a public school in the previous year or been the recipient of a scholarship from either a school tuition organization or the ESA. See A.R.S. § 15–2401(5). A qualifying student can receive a scholarship equal to ninety percent of the base support level that otherwise would be provided for state education of the student. A.R.S. § 15–2402(C). The parent of a scholarship student must agree to provide an education for the student in at least "reading, grammar, mathematics, social studies and science," and agree to "[n]ot enroll the qualified student in a school district or charter school and release the school district from all obligations to educate the qualified student." A.R.S. § 15–2402(1), (2). The parent may then apply the scholarship funds to one or more of eleven permissible uses:

(a) Tuition or fees at a qualified school.

(b) Textbooks required by a qualified school.

(c) Educational therapies or services for the qualified student from a licensed or accredited practitioner or provider.

(d) Tutoring services provided by a tutor accredited by a state, regional or national accrediting organization.

(e) Curriculum.

(f) Tuition or fees for a nonpublic online learning program.

(g) Fees for a nationally standardized norm-referenced achievement test, advanced placement examinations or any exams related to college or university admission.

(h) Contributions to a qualified tuition program established pursuant to 11 United States Code section 529.

(i) Tuition or fees at an eligible postsecondary institution.

(j) Textbooks required by an eligible postsecondary institution.

(k) Fees for management of the empowerment scholarship account by firms selected by the department.

A.R.S. § 15–2402(B)(4)(a)–(k). A "qualified school" is defined as "a nongovernmental primary or secondary school or a preschool for handicapped students that is located in this state and that does not discriminate on the basis of race, color or national origin." A.R.S. § 15–2401(4).

¶3 Niehaus filed a complaint in Maricopa County Superior Court challenging the constitutionality of the ESA and seeking to enjoin Huppenthal from implementing its provisions. She argued the ESA violated Article 9, Section 10 of the Arizona Constitution (the Aid Clause), and Article 2, Section 12 of the Arizona Constitution (the Religion Clause), and that the ESA is invalid because it conditions the availability of a public benefit on a waiver of constitutional rights. She also filed an application for a preliminary injunction. After the trial court allowed the Goldwater Institute and other interested individuals (collectively, Intervenors) to intervene, they successfully moved to dismiss Niehaus's claim that the ESA places an unconstitutional condition on receipt of a government benefit. The trial court subsequently heard oral argument on the merits, denied Niehaus's request for injunctive relief, and granted judgment in favor of Huppenthal and Intervenors on Niehaus's complaint, finding the

ESA did not violate the provisions of the Arizona Constitution cited by Niehaus. The court found the ESA did not violate the Aid Clause because of the "parental choice among education options," explaining that the "monies are earmarked for a student's educational needs as a parent may deem fit— not endorsed directly to a private institution in an all or nothing fashion." It also found the Religion Clause was not violated because the state "is not directing where monies are to go," so there "is no purpose by the State to directly benefit any religious school."

¶4 Niehaus timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and A.R.S. § 12–2101(A)(1) and (5)(b) (Supp.2012).

## STANDARD OF REVIEW

¶5 Niehaus argues on appeal that the ESA violates the Aid and Religion Clauses of the Arizona Constitution, and that it unconstitutionally conditions a benefit on the waiver of a constitutional right. We review questions of statutory interpretation and constitutional law de novo. *State ex rel. Thomas v. Klein,* 214 Ariz. 205, 207, ¶5, 150 P.3d 778, 780 (App.2007). We presume that a statute is constitutional. *Planned Parenthood Ariz., Inc. v. Am. Ass'n of Pro–Life Obstetricians & Gynecologists,* 227 Ariz. 262, 268, ¶9, 257 P.3d 181, 187 (App.2011). We resolve any doubts in favor of constitutionality. *Klein,* 214 Ariz. at 207, ¶5, 150 P.3d at 780. The party challenging the validity of the statute bears the burden of proving beyond a reasonable doubt that the legislation is unconstitutional. *Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 438, 641 P.2d 1275, 1282 (1982) (courts "will not declare an act of the legislature unconstitutional unless we are satisfied beyond a reasonable doubt that the act is in conflict with the federal or state constitutions"); *State v. Kaiser,* 204 Ariz. 514, 517, ¶8, 65 P.3d 463, 466 (App.2003).

## DISCUSSION

*Religion Clause*

¶6 In *Cain v. Home (Cain I ),* 218 Ariz. 301, 305–06, ¶8, 183 P.3d 1269, 1273–74 (App. 2008), *vacated by Cain v. Home (Cain II ),*

220 Ariz. 77, 202 P.3d 1178 (2009), this court distinguished Arizona's case law from a Washington case relied on by Cain, *Witters v. State Commission for the Blind,* 112 Wash.2d 363, 771 P.2d 1119 (1989), and held that the Arizona Supreme Court's interpretation of the Religion Clause was "virtually indistinguishable from the United States Supreme Court's interpretation of the federal Establishment Clause." To support this holding, we cited *Kotterman v. Killian,* 193 Ariz. 273, 287, ¶ 46, 972 P.2d 606, 620 (1999), and *Community Council v. Jordan,* 102 Ariz. 448, 451–52, 432 P.2d 460, 463–64 (1967). In *Cain II,* the Arizona Supreme Court noted our analysis of the Religion Clause, but did not indicate whether our conclusion was correct. 220 Ariz. at 80–81, 84 n. 4, ¶¶ 11–12, 29, 202 P.3d at 1181–82, 1185 n. 4. Instead, the supreme court focused on distinguishing the Religion and Aid Clauses. *Id.* at 81–82, ¶¶ 15–19, 202 P.3d at 1182–83. Then, when deciding the voucher program in that case violated the Aid Clause, the supreme court did not address the Religion Clause argument. *Id.* at 84 n. 4, ¶ 29, 202 P.3d at 1185 n. 4. Thus, we re-examine the case law interpreting the Religion Clause of the Arizona Constitution.

¶ 7 Article 2, Section 12, of the Arizona Constitution provides that "[n]o public money ... shall be appropriated for or applied to any religious worship, exercise, or instruction, or to the support of any religious establishment." Niehaus relies on *Witters* to show that a statute may be upheld under the Establishment Clause while being invalidated under a stricter state constitution, pointing out that Washington's Religion Clause is virtually identical to Arizona's. While we acknowledge this point, we do not find *Witters* particularly helpful to our analysis here. Witters applied for vocational rehabilitation funds from a state commission for the blind. 771 P.2d at 1120. He planned to use the funds in undergraduate work for religious instruction to pursue a career as a pastor. *Id.* His curriculum included Old and New Testament studies and church administration. *Id.* The Washington Supreme Court found that Witters was "asking the State to pay for a religious course of study at a religious school, with a religious career as his

goal. This falls precisely within the clear language of the state constitutional prohibition against applying public moneys to any religious instruction." *Id.* at 1121.

¶ 8 The ESA does not bear any similarity to the circumstances in *Witters.* The parents of a qualified student under the ESA must provide an education in reading, grammar, mathematics, social studies, and science. Whether that is done at a private secular or sectarian school is a matter of parental choice. The ESA students are pursuing a basic secondary education consistent with state standards; they are not pursuing a course of religious study. We also note that our supreme court has distanced itself from the Washington court's interpretation of its religion clause. *Kotterman,* 193 Ariz. at 291–92, ¶¶ 68–71, 972 P.2d at 624–25. At least thirty states have religion clauses in their constitutions similar to our own, and while those states' judicial decisions may be useful, they do not control Arizona law. *Id.* at ¶ 68. The Arizona Constitution differs in its historical circumstances and subsequent development from that of the State of Washington. *Id.* at ¶¶ 70–71.

¶ 9 Consequently, we turn to our Arizona case law concerning the Religion Clause. *Kotterman* involved a state tax credit for those who donate to school tuition organizations (STOs), charitable organizations providing scholarships and grants to allow parents choice in their children's school attendance. *Id.* at 276–77, ¶ 1, 972 P.2d at 609–10. A "qualified school" under the statute was defined as "a nongovernmental primary or secondary school in this state that does not discriminate on the basis of race, color, sex, handicap, familial status or national origin and that satisfies the requirements prescribed by law for private schools in this state." *Id.* at 277, ¶ 1, 972 P.2d at 610. In its discussion of the Religion Clause, the supreme court determined that the tax credit was not an appropriation, but stated that "[e]ven if we were to agree that an appropriation of public funds was implicated here, we would fail to see how the tax credit for donations to a student tuition organization violates this clause. The way in which an STO is limited, the range of choices reserved

to taxpayers, parents, and children, the neutrality built into the system—all lead us to conclude that benefits to religious schools are sufficiently attenuated to foreclose a constitutional breach." *Id.* at 287, ¶ 46, 972 P.2d at 620.

¶ 10 In *Jordan,* the supreme court rejected the argument that any public monies channeled through a religious organization would aid that church contrary to constitutional mandate. 102 Ariz. at 451, 432 P.2d at 463. Instead, the supreme court upheld payments partially reimbursing the Salvation Army for emergency welfare services it had provided, stating that the Religion Clause was not intended to place a blanket prohibition against channeling public funds to religious organizations, but rather to prohibit "assistance in any form whatsoever which would encourage or tend to encourage the preference of one religion over another, or religion per se over no religion." *Id.* at 454, 432 P.2d at 466.

■ ¶ 11 The ESA does not result in an appropriation of public money to encourage the preference of one religion over another, or religion per se over no religion. Any aid to religious schools would be a result of the genuine and independent private choices of the parents. The parents are given numerous ways in which they can educate their children suited to the needs of each child with no preference given to religious or nonreligious schools or programs. Parents are required only to educate their children in the areas of reading, grammar, mathematics, social studies, and science.

¶ 12 The ESA is neutral in all respects toward religion and directs aid to a broad class of individuals defined without reference to religion. The ESA is a system of private choice that does not have the effect of advancing religion. Where ESA funds are spent depends solely upon how parents choose to educate their children. Eligible school children may choose to remain in public school, attend a religious school, or a nonreligious private school. They may also use the funds for educational therapies, tutoring services, online learning programs and other curricula, or even at a postsecondary institution. We therefore concur with the trial court that the ESA does not violate the Religion Clause.

### *Aid Clause*

■ ¶ 13 Article 9, Section 10, of the Arizona Constitution, referred to as the "Aid Clause," states that "[n]o tax shall be laid or appropriation of public money made in aid of any church, or private or sectarian school, or any public service corporation." The Aid Clause is "primarily designed to protect the public fisc and to protect public schools." *Cain II,* 220 Ariz. at 82, ¶ 19, 202 P.3d at 1183. The framers of the Arizona Constitution "considered public education of prime importance," and "intended that Arizona have a strong public school system to provide mandatory education." *Id.* at ¶¶ 20–21.

■ ¶ 14 The Aid Clause prohibits the appropriation of public money to private or sectarian schools. "An appropriation earmarks funds from 'the general revenue of the state' for an identified purpose or destination." *Kotterman,* 193 Ariz. at 287, ¶ 45, 972 P.2d at 620 (citation omitted); *see League of Ariz. Cities and Towns v. Martin,* 219 Ariz. 556, 560, ¶ 15, 201 P.3d 517, 521 (2009) (an appropriation is "the setting aside from the public revenue of a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other." (citation omitted)). In *Martin,* our supreme court stated that the essential components of an appropriation are the "certain sum," the "specified object," and the "authority to spend." 219 Ariz. at 560, ¶ 15, 201 P.3d at 521 (citations omitted). Here, our focus is on the "specified object" of the appropriation.

¶ 15 The specified object of the ESA is the beneficiary families, not private or sectarian schools. Parents can use the funds deposited in the empowerment account to customize an education that meets their children's unique educational needs. Depending on how the parents choose to educate their children, this may or may not include paying tuition at a private school. As we have noted, parents may use the funds for tuition, educational therapies, tutoring services, curriculum, online learning programs, standardized tests, or

advanced placement examinations. The choices are not limited to nongovernmental providers. The ESA funds may be used at eligible postsecondary institutions, which include community colleges and public universities. A.R.S. § 15–2401(2) (now A.R.S. § 15–2401(3) (Supp.2012)). Parents may direct scholarship account funds to those public educational institutions to satisfy their children's K–12 educational requirements. Thus, beneficiaries have discretion as to how to spend the ESA funds without having to spend any of the aid at private or sectarian schools.

¶ 16 Niehaus relies on *Cain II* to support her argument that the ESA violates the Aid Clause and that the state "must provide education solely through the public-school system, and that it may not divert funds to private schools." The appropriation in *Cain II* involved two voucher programs that set aside state money to allow students to attend private schools instead of the public schools in their districts. 220 Ariz. at 79, ¶ 2, 202 P.3d at 1180. Parents would select the private secular or sectarian school of their choice and the state would then disburse a check to the parent, who was required to "restrictively endorse" the check for payment to the selected school. *Id.* at 79–80, ¶ 5, 202 P.3d at 1180–81. The supreme court found the voucher programs did precisely what the Aid Clause prohibits because the funds were withdrawn from the public treasury and earmarked for an identified purpose, funding private schools. *Id.* at 82, ¶ 23, 202 P.3d at 1183. The superintendent argued the programs were constitutional because, under the "true beneficiary" theory, the children were the true beneficiaries of the aid rather than the institution. *Id.* at 82, ¶¶ 23–24, 202 P.3d at 1183. The supreme court rejected this argument because, essentially, the voucher programs transferred state funds directly from the state treasury to private schools. *Id.* at 83, ¶ 26, 202 P.3d at 1184. The court found it immaterial that the checks first passed through the hands of parents because once a student had been accepted into a qualified school, the parents had no choice but to endorse the check to the qualified school. *Id.* It was because of the "composition of these voucher programs" that the court found the true beneficiary theory exception would nullify the prohibition of aid to private and religious schools. *Id.* at ¶ 27.

¶ 17 In the programs disapproved in *Cain II,* the state was paying money directly to the institutions; although the payment first went to parents, they then went ineluctably to private schools. *Id.* at ¶ 26. The court noted, however, that there "may well be ways of providing aid to these student populations without violating the constitution." *Id.* at ¶ 29. Under the ESA, the state deposits funds into an account from which parents may draw to purchase a wide range of services, including educational therapies, home-based instruction, curriculum, tutoring, and early community college enrollment, from religious, nonreligious, and public providers. Thus, unlike in *Cain II,* in which every dollar of the voucher programs was earmarked for private schools, none of the ESA funds are preordained for a particular destination.

¶ 18 Niehaus contends that the state may only provide education through the public schools and that it may not divert funds in any way to private schools. The supreme court has never interpreted the Aid Clause to mean that no public money can be spent at private or religious schools. *See, e.g., Kotterman,* 193 Ariz. at 286, ¶ 42, 972 P.2d at 619 ("[W]hile the plain language of the provisions now under consideration indicates that the framers opposed direct public funding of religion, including sectarian schools, we see no evidence of a similar concern for indirect benefits."). In *Jordan,* the supreme court rejected the argument that no public funds could be given to private secular or sectarian schools or organizations at all, "notwithstanding the fact that the organization [was] merely a conduit," and instead adopted the approach to "take a more practical look at the facts and circumstances of each individual case and realistically analyze the situation to see if there is any violation of state or federal constitutional prohibitions." 102 Ariz. at 456, 432 P.2d at 468. We reject Niehaus's notion that if any state funds end up at private schools the program is automatically unconstitutional. This program enhances the ability of parents of disabled children to choose

how best to provide for their educations, whether in or out of private schools. No funds in the ESA are earmarked for private schools. Thus, we hold that the ESA does not violate the Aid Clause.

### Waiver of Constitutional Right

¶ 19 Niehaus asserts that the ESA unconstitutionally conditions receipt of a government benefit on the waiver of a constitutional right because it requires that the parent of a qualified student promise not to enroll the student in public school. The Arizona Constitution requires the legislature to provide a free public education to pupils between the ages of six and twenty-one years. Ariz. Const. art. 11, § 6; *Shofstall v. Hollins*, 110 Ariz. 88, 90, 515 P.2d 590, 592 (1973). To enroll a student in the ESA, the parent must agree to "[n]ot enroll the qualified student in a school district or charter school and release the school district from all obligations to educate the qualified student." A.R.S. § 15-2402(2). Niehaus uses a number of hypothetical scenarios to argue that this provision is unconstitutional, asserting that public schools will be unavailable to children withdrawing from the ESA, that they will be forced to reimburse lawfully expended funds, and that students will be forced to remain in private schools. These arguments fail for several reasons.

¶ 20 First, the ESA does not require a permanent or irrevocable forfeiture of the right to a free public education. *See State v. Quinn*, 218 Ariz. 66, 73, ¶ 27, 178 P.3d 1190, 1197 (App.2008) (states may not condition the grant of a privilege on the permanent surrender of a constitutional right). All the ESA requires is that students not simultaneously enroll in a public school while receiving ESA funds. This same restriction applies to any children who attend private school or are home-schooled. *See* A.R.S. § 15-802(B)(2) (2009) (requiring parent of a child attending a private school or being home-schooled to file an affidavit of intent with the county). In practice, parents that have taken advantage of the ESA have been able to re-enroll their children in a public school. During the first quarter, five recipients withdrew from the program, forfeiting $16,622.28 remaining

from the first quarter's disbursement, and re-enrolled their children in public schools. Pursuant to the Arizona Constitution and the federal Individuals with Disabilities Education Act (IDEA), the public school is obligated to accept a child that has terminated the ESA contract just as the public school would be obligated to accept any other child. *See* Ariz. Const. art. 11, § 6; 20 U.S.C.A. §§ 1400–1482 (under IDEA, school district cannot refuse to provide a free appropriate public education to any child with a disability).

¶ 21 Second, parents are not coerced in deciding whether or not to participate in the ESA. *See Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (striking down property tax exemption for veterans that was conditioned on beneficiaries attesting they did not advocate the overthrow of the government by force and violence); *Frost v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 593, 46 S.Ct. 605, 70 L.Ed. 1101 (1926) (state does not have "power to compel a private carrier to assume against his will the duties and burdens of a common carrier"). Parents are free to enroll their children in the public school or to participate in the ESA; the fact that they cannot do both at the same time does not amount to a waiver of their constitutional rights or coercion by the state.

¶ 22 Finally, the ESA does not limit the choices extended to families but expands the options to meet the individual needs of children. Section 15-2402(C) sets the ESA account funds at ninety percent of the base support level for that particular student. For example, if the parents desired to use ESA funds for a text book or education therapies, the parent would have to withdraw the child from public school at least temporarily. If the parent then enrolled the child in a private school, ESA funds for tuition would be limited. Thus, the ESA program does not force or encourage parents to use ESA funds to pay private school tuition. The ESA is neutral as to the parental choices offered. It is simply an exchange of one type of educational service for another, and the choice is voluntary and reversible. The funds are disbursed on a quarterly basis so

any reimbursement would not be the full value of the ESA scholarship. A.R.S. § 15–2403(F).

¶ 23 Because we conclude that the ESA does not unconstitutionally condition receipt of a government benefit on the waiver of a constitutional right, we need not address the Intervenors' and Huppenthal's argument that Niehaus lacks standing to raise this issue.

### CONCLUSION

¶ 24 Based on the foregoing, we affirm the trial court's judgment. Niehaus requests an award of attorneys' fees under A.R.S. § 35–213(c) and under the private attorney general doctrine. Because Niehaus is not the prevailing party, we deny the request for attorneys' fees.

CONCURRING: JOHN C. GEMMILL, Presiding Judge, and DONN KESSLER, Judge.